(57 App. Div. 193.)

### GARVEY v. NEW YORK BUILDING LOAN BANKING CO.

(Supreme Court, Appellate Division, Second Department. January 31, 1901.)

MORTGAGES—CONTRACT—MISUNDERSTANDING—REFORMATION.

    To secure a loan of $1,900, G., who could not read, executed a bond and mortgage for $2,400 to the company making the loan, thinking the papers were a bond and mortgage for $1,900. Both G. and her husband, acting as her agent, understood perfectly that they were to pay $18 a month till $1,900 were paid. The company did not make clear to G. the meaning of the transaction by which a premium of $500 was added to the amount of the loan, and the bond and mortgage made for $2,400. No fraud was intended. *Held*, that the company's failure to make clear its proposition did not entitle G. to have the bond and mortgage reformed, since the parties were not in fiduciary relations, and G. understood the material parts of the transaction.

Appeal from special term, Kings county.

Action by Margaret Garvey against the New York Building Loan Banking Company. From a judgment in favor of plaintiff, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCH-BERG, JENKS, and SEWELL, JJ.

William H. Hamilton, for appellant.
Theodore Witte, for respondent.

JENKS, J. The defendant appeals from a judgment of the special term in favor of the plaintiff in her action brought to reform a mortgage on the ground of fraud. The plaintiff owned certain realty in the borough of Brooklyn, incumbered with two mortgages for $1,600 and $150, respectively. Plaintiff, seeking to clear them off, applied in May, 1899, to the defendant for a loan of $1,900. At the close of the negotiation she found herself a subscriber to 24 shares of stock of the defendant, the maker of a bond and mortgage to the association, and bound to pay certain monthly dues and interest monthly, aggregating $18 a month. The defendant was obligated to pay the interest on the said mortgage, and to discharge the same on or before the maturity of the stock. It paid off the second mortgage, and advanced to the plaintiff $150, less $53, which represented certain charges for searching and payments of certain arrearages. Thus the account stood $1,750 to be applied to the existing mortgages, and $150 in cash, less the disbursements, making $1,900, which, with the premium of $500 added, aggregated $2,400, the amount named in the mortgage. The plaintiff paid the charges of $18 a month for several months, but in August, 1899, brought this action. After the defendant had examined its first witness on the trial, plaintiff, under objection and exception, amended her prayer so as to include a demand for cancellation. The learned trial justice stated as the grounds of his decision that the plaintiff understood that the defendant, in granting her application, would lend her $1,900 only at legal interest; that the premium bid on the shares of stock upon plaintiff's application was to her wholly unmeaning, and that she was utterly ignorant of the contents, meaning, and effect; that she could not read, and that her husband was illiterate, and that the meaning of the transaction and the papers signed by them, namely, the application for shares, and the premium bid, and the bond and mortgage, were not explained by the defendant so as to be understood by the plaintiff and her husband, and that they were ignorant of the fact that the papers signed at that time were other than a bond and mortgage for $1,900 at legal interest. The court further stated that the defendant's agents intended no willful fraud on the plaintiff, but that defendant failed to explain the true meaning and effect of the complicated contract into which the plaintiff unknowingly entered, as above stated. The court decided that the mortgage is a mortgage to secure a simple loan for $1,900, bearing interest at 6 per cent. per annum; that the payments made under the contract—some $81—must be applied to simple interest, and the balance, if any, then applied on the principal; and that judgment must follow such decision, to provide that, when the defendant re-

ceived payment of the sum of $1,900, with interest at 6 per cent., from which sum there should be deducted the sum due for principal and accrued interest on the first mortgage for $1,600, then a lien on the said premises, which defendant agreed to pay, and also after deducting the monthly payments from the plaintiff to the defendant in the sum of $81.21, the defendant execute and deliver a satisfaction piece discharging the said mortgage. Judgment was entered in accordance with the additional provision that, in case the plaintiff failed within 50 days from the date of said judgment to make or to tender to the defendant or its attorneys the payments heretofore prescribed, then the complaint should be dismissed on the merits, without costs.

I am of opinion that the plaintiff is not entitled to a reformation. Before this relief could be obtained, it must appear that both parties intended by their contract that there should be a bond and mortgage for $1,900, with interest at 6 per cent. per annum, and that the intention was not carried out on account of fraud, accident, or mutual mistake. Jackson v. Andrews, 59 N. Y. 244, 247, distinguished and approved in Kilmer v. Smith, 77 N. Y. 226, 231. There is nothing to establish accident or mutual mistake. The learned court did not decide that the defendant was guilty of any fraud. It decided that the defendant intended no willful fraud on the plaintiff, from which I infer that the court meant that there was no intent on the part of the defendant to defraud the plaintiff. The fault found by the court is that the defendant did not explain the transaction so as to be understood, and that it failed to explain the true meaning and effect of the complicated contract. Examination of the testimony shows that the plaintiff and her husband, who acted with her, were not in ignorance of any material fact, and that the gravamen of their grievance is that the mortgage is for $2,400, instead of for $1,900. Referring to the conversation with Dickerman, the real-estate broker who submitted the loan to the defendant, the husband testifies that he understood the loan was to be paid by him or by his wife by the payment of $18 per month. "That is what they told me,—the parties in the office; Mr. Dickerman also. And he estimated it would take about ten years, I think, to pay it back. * * * He said by paying at the rate of $18 each month. Altogether, he said, $18 on $1,900 loan. That included everything except the $62.50 for searching the title. * * * I do know this: that I was to pay $18 a month for a long period of time; as I remember it, for ten years; and then my property was to be free and clear of all incumbrances in ten years, and I was to pay $62.50 for searching the title in the start. * * * In case I did not pay this $18 a month, I understand there was to be a fine. They said that there would be a fine, but still I didn't understand it; but I remember the fine just the same. * * * I tell you I had malaria for several years, and I have got no memory in the world, but there are two or three things I do recollect. One, that the payment would be $18 a month. That is right. I remember that. Also for ten years—on or before ten years. The agent, Mr. Dickerman told me that. * * * I do understand one thing; that is, I was to make my payments every month at the rate of $18 a month for a period of ten years, and also this additional sum for searching

the title, and then it was understood that my house would be free and clear of mortgages, the same as any bank would loan straight. I think I did have a loan before where I had to pay every month. I think it was here in Brooklyn. I couldn't remember now what that transaction was. I had a loan where I paid every month. It was on a house on Forty-Fourth street. * * * I had a pass book. Q. Well, everything is right and straight and regular except that you think $1,900 should be put in the papers where you find twenty-four? A. No, everything ain't straight. It ought to be $1,900; yes. I don't know now whether everything is straight or not. It ought to be $1,900. I made one of these payments in the pass book. I think the first one." Further the witness testified after the application was read to him by counsel: "I wouldn't understand it in forty years, or my wife. I know I made the application for $1,900,—for a loan of $1,900. Q. But this application states that it was twenty-four shares of stock,—$2,400. A. $2,400? Q. Yes. A. That was made last fall." The plaintiff testified that she instructed her husband to make the application, as she was ill, and that she attended and signed the various papers. Referring to the mortgage for $2,400, she testified: "I wrote that, but I didn't write for no $2,400. I wrote for $1,900, as I was told. * * * I asked him if he was going to give me the present mortgage,—the money to pay those mortgages that was due,—and he said, 'No'; that they would take care of that mortgage. As soon as they came due, the company would pay the money. And I asked him then how much was his expenses, and he said sixty-two dollars and some odd cents. I don't remember the amount, but that included all the expenses on the $1,900 he was to loan me on my house in Spencer street. Then I asked him how I would pay that $1,900 off. He said I would pay $18 every month until I paid the $1,900 off, and that is all he said to me, and he gave me the papers to sign. * * * I afterwards paid money on account of these monthly payments over in the building loan association. They took out— They fixed the book up. Then, the month after, my husband took over $18, and then there was, I think, three payments in Brooklyn. I paid two. I made those payments. I said it was made under protest, under my lawyer's orders. * * * I did not understand that I was to pay a premium of $500 for the privilege of obtaining this loan. They did not say a word about it. They told me all I had to pay was $1,900 at $18 per month. That is all that was explained to me. They didn't say how long I was to pay this $18 a month. I don't know how I did get the idea of twelve years in my complaint. * * * I didn't stop to inquire how long I would have to pay $18 per month. I thought I would have to pay $18 a month until I would have the $1,900 paid. I don't think my husband told me I would have to pay ten or twelve years. He might have. I don't remember if he has. * * * I understand plain words: I understood I was to pay $18 a month. I understood I was to pay $18 a month until I had paid the $1,900. That is what I understood then and now. I didn't think how long or how short that would take me. I have not thought anything about the time. I thought I would have to pay that every month until I had paid it; that was, their mortgage, I would have to pay off, $1,900. * * * Q. Would

you be satisfied if it was simply a twelve-years mortgage? A. No, I would not be satisfied to pay $18 a month for twelve years. How much would it be? Would it be more than $1,900? Would I have to pay this company more than $1,900? Q. You say you were falsely led to believe by the defendant that you could cancel the loan in a period of twelve years by paying $18 per month. Now, if that were true, if you could cancel this loan in a period of twelve years at $18 a month, wouldn't that be perfectly satisfactory; would not that be according to their representation? A. No. How much money would that be? Would that be more than $1,900? You are a scholar, and I am not. You ought to be able to tell me. I am only a poor woman. I can't afford to have any one rob me of the bit," etc. Thus it is established by the plaintiff's own testimony and by that of her husband, her agent, that they understood perfectly well that they were to pay $18 a month until the mortgage of $1,900 was paid off, though the husband thinks that 10 years, rather than 12 years, was mentioned. Then the plaintiff and her husband understood the material thing perfectly well when they entered into the transaction. If the arrangement consummated provided for this, and did not put any greater burden upon the plaintiff, then it is hard to see how she has been imposed on. The grievance is that the form of the mortgage called for $2,400 in the scheme, whereby such payments of $18 a month would discharge the incumbrances. The anxiety of the plaintiff is as to the substance, lest by the insertion of $2,400 in the bond and mortgage she should be compelled more than she contemplated and knowingly agreed to pay, to wit, the $1,900, by such payments of $18. The defendant's secretary testified that if the plaintiff paid this $18 a month for 144 months, her payments would amount to $2,592 against which there would be the defendant's disbursement of $150 in cash, and $150 paid off on the second mortgage, and the payment of $1,600 to pay off the first mortgage,—making $1,900, which, deducted from the said $2,- 592, leaves $692 paid as interest. This is at the rate of $57.66 a year as against $114 a year, the sum which she would have paid as interest on $1,900 at 6 per cent. per annum on an ordinary bond and mortgage; or, in other words, the comparison is interest at 3 per cent. per annum with interest at 6 per cent. per annum. Or, to make the comparison another way: If the mortgage were for $1,900 at 6 per cent. per annum interest, that interest would be $114 a year, and for twelve years would be $1,368. But the principal of $1,900 would remain; so, to clear off the incumbrance, the payments must be $1,368 plus $1,900, or $3,268. Under the present scheme, $18 a month would amount to $216 a year, or to $2,592 in 12 years; but the scheme contemplates the full discharge of the mortgage by such payments. The difference, then, in the net results would be between $3,268 and $2,- 592, or $676, to the advantage of the mortgagor; and, though the difference between the net annual payments would be that between $2,592 and $1,368, or $1,224, yet that difference secures the paying off of the principal. Of course, there is the consideration that the $18 is paid monthly, while the interest on the ordinary mortgage is not usually so paid; but the calculation made is not minute, but only in

the rough. Let me not be understood as indorsing, far less exploiting, the scheme; but at the same time I am stating it on the theory that the plaintiff entered into it fully understanding that she was to pay $18 a month to clear off the incumbrances, and taking it as it presents itself upon its face. The court does not exercise a visitatorial function over the express contracts of individuals with corporations, and does not set them aside on the regret or repentance of litigants, or upon the showing that the contract was improvident, or the conditions thereof unfair, or that the expectations were illusory. Building Co. v. Lynch, 54 App. Div. 559, 67 N. Y. Supp. 6; Loan Co. v. Samuels, 43 App. Div. 386, 60 N. Y. Supp. 91. Judge Story, in his Equity Jurisprudence (volume 1, p. 339) says:

"But the mere fact that the bargain is a very hard or unreasonable one is not generally sufficient per se to induce those courts to interfere. And, indeed, it will be found that there are very few cases not infected with positive or actual fraud in which they do interfere, except where the parties stand in some very peculiar predicament, and in some sort under the protection of the law from age, or character or relationship."

The burden, then, is that meantime the premises are subject to a mortgage in the sum of $2,400, instead of $1,900, the difference rep resenting the premium, which is never paid in cash, but which serves as basis for the scheme whereby the transaction might be carried out on the payment of the $18 a month. But this burden is apparent, rather than real. The mere fact that the scheme of the transaction was not explained so as to be understood by the plaintiff and her husband, or that the defendant failed to explain to the plaintiff the true meaning and effect of the complicated contract, which seems to have been the sole moving cause in the mind of the learned trial justice, admits of two answers. First. There was no relation of trust and confidence between the parties. They dealt at arm's length. The plaintiff and her agent were free. It was their duty to gain all knowledge that they desired by inquiry or by examination. They could not choose to enter into the transaction not fully understanding it, and then, after its execution and action thereon, allege their lack of comprehension as a ground for equitable relief where there was no relation of trust and confidence between the parties thereto. Dambmann v. Schulting, 75 N. Y. 56, 61, 62. Second. They did understand the material parts of the transaction. They had had a similar transaction before this one, and they both testified repeatedly that they understood they were to pay $18 a month for the purpose of clearing off these incumbrances. Though they claim to have found out the fraud in July, they continued to pay their $18 monthly until October, and permitted the defendant to clear off the second mortgage of $150 in August.

The judgment must be reversed, but under the peculiar circumstances we think it should be without costs. All concur, except SEWELL, J., taking no part.